UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOSHUA HAGAN,

                    Petitioner,

v.                                    Case No. 3:05-cv-1274-J-33MCR

JAMES R. MCDONOUGH,
et al.,

                    Respondents.

_____

## **ORDER**

### **I. Status**

        Petitioner Joshua Hagan, an inmate of the Florida penal system

proceeding *pro se*, initiated this action by filing a Petition for

Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) pursuant to

28 U.S.C. § 2254 on December 15, 2005.  Petitioner challenges a

2000 state court (Duval County, Florida) conviction for armed

robbery with a firearm on the following grounds:  (1) ineffective

assistance of trial counsel for (a) failure to investigate,

interview and call Veronica Oliver, Cecil Bell, Donna Hogan,

Desiree Glover, Clifford Harrell and Gloria Jackson, who would have impeached the testimony of Detective Jackson, and (b) failure to investigate the cell phone records of the victim; (2) ineffective assistance of appellate counsel for failure to raise a <u>Batson</u>[1] claim on direct appeal; and, (3) ineffective assistance of trial counsel for failure to advise the trial court of the sleeping jurors, which denied Petitioner a fair trial.

Respondents filed an Answer to Petition for Writ of Habeas Corpus (Doc. #17) (hereinafter Response).   In support of their Response, they submitted exhibits.[2]   Petitioner was instructed on how to properly respond to a motion to dismiss and/or for summary judgment.  <u>See</u> Court's Order to Show Cause and Notice to Petitioner (Doc. #4).   Petitioner has responded.   This case is now ripe for review.

## II. Procedural History

On March 8, 2000, Petitioner was charged with committing one count of armed robbery, while having discharged said firearm.   Ex. A1, Information.   Following a jury trial, Petitioner was convicted of armed robbery, but only while in actual possession of a firearm during the commission of the crime.   Ex. A1, Verdict, filed June 16, 2000; Ex. A2, Transcript of the Jury Trial (hereinafter Tr.) at

---

[1] <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

[2] Respondents' exhibits will be hereinafter referred to as "Ex."

311.  Petitioner, through counsel, filed a post-trial motion for new trial[3] and motion to declare Fla. Stat. § 775.087 (10/20/life Act) unconstitutional.  Ex. A3.  These motions were denied at the commencement of the sentencing proceeding held on July 21, 2000.  Ex. A4.  Petitioner was sentenced to fifteen years of incarceration, to run concurrently with a five-year sentence previously imposed in case number 98-13809.  Id. at 13; Ex. A5, Judgment.

Petitioner, through counsel, raised the following issues on direct appeal: (1) the trial court erred in denying his motion to declare the 10/20/life Act in violation of the separation of powers provision in Article II, Section 3, of the Florida Constitution, and (2) Chapter 99-12, which enacted the 10/20/life Act, violates the single subject rule in Article III, Section 6, of the Florida Constitution.  Ex. A7.  The State filed an Answer Brief, and Petitioner filed a Reply Brief.  Id.; Ex. A8.  On September 13, 2001, the appellate court per curiam affirmed, stating:

> Appellant challenges the constitutionality of the 10/20/Life statute on grounds that it violates the Florida Constitution's separation of powers provision and single subject requirement.  We affirm.
>
> Appellant's separation of powers challenge has already been rejected by this court in Green v. State, 792 So.2d 643 (Fla. 1st DCA 2001).

_____

[3] In the motion for new trial, counsel raised the issue that two of the jurors (Elizabeth McCollister and Sandra Allen) were observed sleeping during closing arguments.  Ex. A3 at 62.

> We do not reach the merits of appellant's single subject challenge as it was not properly preserved for appellate review. <u>See Harvey v. State</u>, 786 So.2d 595, <u>reh'g denied</u>, 786 So.2d 28 (Fla. 1st DCA 2001).

<u>Hagan v. State</u>, 793 So.2d. 1168 (Fla. 1st DCA 2001); Ex. A9. The mandate was issued on October 1, 2001. Ex. A9.

On or about February 17, 2002, Petitioner filed a *pro se* motion for post conviction relief pursuant to Fla. R. Crim. P. 3.850, raising the following grounds: (1) ineffective assistance of trial counsel for failure to object to the State's entering the testimony of witness Hausen Clausell's prior military service to bolster his credibility after the trial court granted a motion in limine concerning Clausell's dishonorable discharge; (2) ineffective assistance of trial counsel for failure to act when Petitioner informed her that the jurors were sleeping during witness testimony and closing argument; (3) ineffective assistance of trial counsel for failure to investigate witnesses who would have substantially impeached the testimony of Detective Jackson; (4) ineffective assistance of trial counsel for failure to independently investigate Hausen Clausell's cell phone records, which would have disclosed that several of the calls would have been attributed to another individual other than the Petitioner; (5) ineffective assistance of trial counsel for failure to adequately prepare to argue that the Youthful Offender Act supercedes the mandatory provisions of the 10/20/life Act; and, (6)

ineffective assistance of trial counsel for the cumulative errors during the course of the criminal proceedings.  Ex. B1.  Following an evidentiary hearing[4] on March 27, 2003, at which Petitioner was represented by counsel, the trial court denied the Rule 3.850 motion on May 14, 2003.  Ex. B2.  Petitioner, through counsel, attempted to initiate an appeal from the denial of the Rule 3.850 motion by filing a notice of appeal to the appellate court on June 20, 2003.  Ex. B3.  On December 29, 2003, the appellate court per curiam dismissed the appeal for lack of jurisdiction, stating "that the notice of appeal was not timely filed."  Hagan v. State, 863 So.2d 400 (Fla. 1st DCA 2003); Ex. B4.  The mandate was issued on January 26, 2004.  Ex. B4.

During the pendency of these Rule 3.850 proceedings in the appellate court, Petitioner, on or about August 6, 2002, filed a *pro se* petition for writ of habeas corpus in the appellate court, asserting ineffective assistance of appellate counsel for failure to raise the following issues on direct appeal:  (1) a properly preserved Batson violation; (2) the trial court's erroneous denial of a motion in limine; and, (3) the trial court's error in denying defense counsel an additional peremptory challenge.  Ex. C1.  On September 24, 2002, the court dismissed the petition; however, upon

---

[4] The complete transcript of the evidentiary hearing is included as "Exhibit E" within the attachments to the trial court's order denying the Rule 3.850 motion.  Ex. B2, Transcript of the Evidentiary Hearing (hereinafter EH Tr.) at 166-99.  Petitioner was represented by private counsel at the evidentiary hearing.

consideration of Petitioner's motion for rehearing, the appellate court reinstated the proceedings on November 6, 2002.  Ex. C2.  On December 5, 2002, the appellate court per curiam denied the petition without issuing a written opinion.  <u>Hagan v. State</u>, 834 So.2d 160 (Fla. 1st DCA 2002); Ex. C3.  The mandate was issued on December 31, 2002.  Ex. C3.

Prior to the dismissal of the Rule 3.850 appellate proceedings (<u>see</u> Ex. B4), Petitioner, through counsel, filed a petition for writ of habeas corpus in the appellate court on or about June 19, 2003, seeking a belated appeal from the May 14, 2003, amended order of the trial court.  Ex. B2; Ex. D1.  The State filed a response.  Ex. D2.  On July 16, 2003, the appellate court granted Petitioner's petition for belated appeal.  Ex. D3.  However, as set forth above, the appellate court, on December 29, 2003, per curiam dismissed the appeal, stating in pertinent part:

> Upon consideration of the appellant's response to the Court's order of November 19, 2003, the Court has determined that the notice of appeal was not timely filed.  Thus, the Court lacks jurisdiction to review the order on appeal.

<u>Hagan</u>, 863 So.2d 400; Ex. B4.  The mandate was issued on January 26, 2004.  Ex. B4.

On or about January 21, 2004, Petitioner filed a *pro se* petition for writ of mandamus in the Supreme Court of Florida.  Ex. E1.  Petitioner sought the reinstatement of the Rule 3.850 appellate proceedings in light of the appellate court's having

granted his petition for belated appeal.  Ex. D3.  On March 4, 2004, the appellate court recognized its own error, stating in pertinent part:

> On the court's own motion, it is hereby ordered that a new proceeding shall be initiated in case number 1D04-929, wherein [the] belated appeal is granted and review on the merits of the amended order denying postconviction relief in Duval Count Circuit Court case number 16-2000-CF-2488-AXXX-MA shall be conducted by this court.

Ex. F1.  In light of the March 4, 2004, order, the Supreme Court of Florida, on April 13, 2004, dismissed Petitioner's petition for writ of mandamus as moot.  Hagan v. State, 872 So.2d 899 (Fla. 2004); Ex. E2.  Petitioner's belated post conviction appeal was finally resolved by the appellate court on October 20, 2004, upon the issuance of the mandate following its September 24, 2004, per curiam decision affirming, without a written opinion, the May 14, 2003, denial of the Rule 3.850 motion.  Hagan v. State, 883 So.2d 803 (Fla. 1st DCA 2004); Ex. F4.

On or about October 5, 2004, Petitioner filed a second *pro se* motion for post conviction relief, raising the following claims: (1) ineffective assistance of trial counsel for failure to act with reasonable diligence and promptness in representing her client, and (2) the trial court lacked subject matter jurisdiction and statutory authority to impose the kind of punishment that no judge under the entire body of sentencing statute could inflict under any

set of factual circumstances.  Ex. G1.  On or about March 9, 2005,
the trial court denied the motion, stating in pertinent part:

> Initially, this Court notes that the
> Defendant's Motion is untimely, in that it was
> filed more than two years after his conviction
> became final.  (Exhibit "B."  Huff v. State,
> 569 So.2d 1247 (Fla. 1990); Delap v. State,
> 513 So.2d 1050 (Fla. 1987); Gust v. State, 535
> So.2d 642 (Fla. 1st DCA 1988).  Further, the
> Defendant has previously filed a Motion for
> Post Conviction, which was denied on its
> merits.    (Exhibits [sic] "C.")  Thus,
> Defendant's instant Motion is procedurally
> barred and constitutes an abuse of process.
> Foster v. State, 614 So.2d 455 (Fla. 1992);
> Ziegler v. State, 632 So.2d 48 (Fla. 1993);
> Ragan v. State, 643 So.2d 1175 (Fla. 3d DCA
> 1994).

Ex. G2.  On June 14, 2005, the appellate court per curiam affirmed
without issuing a written opinion.  Hagan v. State, 905 So.2d 127
(Fla. 1st DCA 2005); Ex. G4.  The mandate was issued on July 12,
2005.  Ex. G4.

In addition, on or about November 28, 2004, Petitioner had
filed a second pro se petition for writ of habeas corpus in the
appellate court, alleging ineffective assistance of appellate
counsel, as well as post conviction counsel.  Ex. H1; Ex. H2.  On
January 28, 2005, the appellate court per curiam denied the
petition, stating in pertinent part:

> We deny the petition, insofar as it
> alleges ineffective assistance of counsel on
> direct appeal, as untimely.  See Fla. R. App.
> P. 9.141(c)(4)(B).  The claim of ineffective
> assistance of postconviction counsel is denied
> on the merits.

8

<u>Hagan v. State</u>, 892 So.2d 552 (Fla. 1st DCA 2005); Ex. H2.

The Petition for Writ of Habeas Corpus, filed in this Court on December 15, 2005, is timely filed within the one-year period of limitation. <u>See</u> Response at 2-11; Court's Order (Doc. #15), filed April 24, 2006; 28 U.S.C. § 2244(d).

### III. Evidentiary Hearing

This Court has carefully reviewed the record and, for the reasons set forth more fully below, concludes Petitioner is not entitled to an evidentiary hearing. A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief. <u>Smith v. Singletary</u>, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); <u>Cave v. Singletary</u>, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing <u>Townsend v. Sain</u>, 372 U.S. 293 (1963)). Here, the pertinent facts of the case are fully developed in the record before the Court. <u>Smith</u>, 170 F.3d at 1054 (stating that a district court does not need to conduct an evidentiary hearing "if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel"). No evidentiary proceedings are required in this Court. <u>High v. Head</u>, 209 F.3d 1257, 1263 (11th Cir. 2000) (citing <u>McCleskey v. Zant</u>, 499 U.S. 467, 494 (1991)), <u>cert</u>. <u>denied</u>, 532 U.S. 909 (2001). The Court can "adequately assess [Petitioner's] claim[s] without further factual development." <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir.

2003), cert. denied, 541 U.S. 1034 (2004).  Therefore, for the reasons set forth above, an evidentiary hearing will not be conducted by this Court.

## IV. Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claims under 28 U.S.C. § 2254(d), as amended by AEDPA. Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert. denied, 538 U.S. 926 (2003); Fugate v. Head, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), cert. denied, 535 U.S. 1104 (2002); Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998), cert. denied, 531 U.S. 840 (2000).

The Eleventh Circuit has described the standard of review under AEDPA:

> Title 28 U.S.C. § 2254 governs the authority of the federal courts to consider applications for writs of habeas corpus submitted by state prisoners.  Section 2254 was amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), which was effective as of April 24, 1996.  AEDPA applies to all petitions filed after its effective date. . . .
>
> AEPDA "places a new constraint on a federal habeas court's power to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by establishing a

deferential standard for reviewing state court judgments in these cases.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).  Subsection (d) of § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

AEDPA also makes clear that substantial deference is to be accorded a state court's findings of fact.  Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

<u>Henderson v. Campbell</u>, 353 F.3d 880, 889-891 (11th Cir. 2003) (footnote omitted), <u>cert</u>. <u>denied</u>, 543 U.S. 811 (2004).

Clearly, the new 28 U.S.C. § 2254(d) creates a more deferential standard for federal court review of state court

adjudications:   "[u]nless a state court decision is directly contrary to Supreme Court case law, we review state court findings of fact and conclusions of law for reasonableness." Van Poyck v. Florida Dep't of Corr., 290 F.3d 1318, 1321 (11th Cir. 2002) (per curiam), cert. denied, 537 U.S. 812 (2002), 537 U.S. 1105 (2003); Mitchell v. Esparza, 540 U.S. 978 (2003) (per curiam) (holding that the Ohio Court of Appeals' decision was not "contrary to" or an "unreasonable application" of clearly established federal law and stressing "the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)").

The "contrary to" and "unreasonable application" clauses have independent meaning and provide separate bases for federal habeas review:

> "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at 1523 (O'Connor, J., concurring).   The "contrary to" clause "suggests that the state court's decision must be substantially different" from the controlling legal precedent. Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), cert. denied, --- U.S. ---, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002) (quoting Williams, 529 U.S. at 405, 120 S.Ct. at 1519).   A state court's decision that applies the correct legal rule would not fit within the "contrary to" clause even if the federal court might have reached a different result relying on the same law. See Williams,

529 U.S. at 404-06, 120 S.Ct. at 1519-20
(O'Connor, J., concurring).

. . . .

"Under the 'unreasonable application' clause,
a federal habeas court may grant the writ if
the state court identifies the correct
governing legal principle from this Court's
decisions but unreasonably applies that
principle to the facts of the prisoner's
case." Williams, 529 U.S. at 414, 120 S.Ct.
at 1523 (O'Connor, J., concurring). In
deciding this issue, the federal court should
consider whether the state court's application
of the law was objectively unreasonable and
should not apply the subjective "all
reasonable jurists" standard. Id. at 409-10,
120 S.Ct. at 1521-22. The Supreme Court
recently adhered to its pronouncements in
Williams, stating that "we stressed in
Williams that an unreasonable application is
different from an incorrect one." Bell v.
Cone, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152
L.Ed.2d 914 (2002). The Court further noted
that "a federal habeas court may not issue a
writ under the unreasonable application clause
'simply because that court concludes in its
independent judgment that the relevant state-
court decision applied clearly established
federal law erroneously or incorrectly.'" Id.
(quoting Williams, 529 U.S. at 411, 120 S.Ct.
at 1522 (O'Connor, J., concurring)).

Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002).

The Eleventh Circuit has addressed the application of the

"contrary to" clause in reviewing a state court adjudication:

In applying the "contrary to" prong of
AEDPA, we have recognized that where no
Supreme Court precedent is on point, "we
cannot say that the state court's conclusion
. . . is contrary to clearly established
Federal law as determined by the U.S. Supreme
Court." McIntyre v. Williams, 216 F.3d 1254,
1258 (11th Cir. 2000).

Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir.), cert. denied, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine whether the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, AEDPA "also directs that a presumption of correctness be afforded factual findings of state courts, which may be rebutted only by clear and convincing evidence. See id. at § 2254(e)(1). This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003). Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

## V. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel.  That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted). "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 125 S.Ct. 2456, 2462 (2005) (citations omitted).  If counsel's performance falls "below the line of reasonable practice, there is a further question about prejudice, that is, whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 2467 (citation omitted).

The Eleventh Circuit has captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  Establishing these two elements is not easy:  "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).

15

For assessing a lawyer's performance, <u>Chandler v. United States</u>, 218 F.3d 1305 (11th Cir. 2000) (en banc) <u>cert</u>. <u>denied</u>, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), sets out the basic law: "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." <u>Id</u>. at 1314 (internal marks omitted). . . . Our role in reviewing an ineffective assistance claim is not to "grade" a lawyer's performance; instead, we determine only whether a lawyer's performance was within "the wide range of professionally competent assistance." <u>See</u> <u>Strickland</u>, 104 S.Ct. at 2066.

The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." <u>See</u> <u>Chandler</u>, 218 F.3d at 1315. . . .

A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." <u>Strickland</u>, 104 S.Ct. at 2067. Instead, a petitioner must establish that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given adequate assistance. <u>See</u> <u>id</u>. at 2068.[5]

<u>Van Poyck</u>, 290 F.3d at 1322-23 (footnotes omitted).

_____

[5] However, "when a defendant raises the unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." <u>Davis v. Sec'y</u> <u>for the Dep't of Corr.</u>, 341 F.3d 1310, 1316 (11th Cir. 2003) (per curiam) (citation omitted).

In sum, "[w]ithout proof of both deficient performance and prejudice to the defense, . . . it could not be said that the sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,' and the sentence or conviction should stand." Bell v. Cone, 535 U.S. 685, 695 (2002) (internal citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

## VI. Findings of Fact and Conclusions of Law

### A. Ground 1(a)

As ground 1(a), Petitioner contends that defense counsel was ineffective for failure to investigate, interview and call Veronica Oliver, Cecil Bell, Donna Hogan, Desiree Glover, Clifford Harrell and Gloria Jackson, who would have impeached the testimony of Detective Jackson. Respondents acknowledge that Petitioner raised this claim in his Rule 3.850 motion. Response at 14. The trial court adjudicated this claim on the merits. In denying this claim, the trial court identified the two-prong Strickland ineffectiveness test as the controlling law and stated in pertinent part:

> In ground three, Defendant asserts that counsel rendered ineffective assistance by failing to call witnesses that would have impeached some statements made by Detective Jackson during the initial investigation regarding Defendant's involvement in the charged offense and how long Detective Jackson actually knew Defendant. This Court disagrees. This Court notes that the proposed testimony of the listed witnesses does not address the innocence or guilt of Defendant in the charged offense. Additionally, upon

17

review of the trial record, this Court notes
that Detective Jackson testified that he
initially met Defendant a year or so ago with
his sister and nephew and during his initial
investigation he approached Defendant and
stated he hoped Defendant was not involved.
(Exhibit "C," pages 200-203.) Detective
Jackson stated that Defendant got up and
walked away form him and Detective Jackson
then continued with his investigation.
(Exhibit "C," page 203.) Detective Jackson
testified further that the victim identified
Defendant as the perpetrator from a photo
spread and several phone calls could have been
attributed to Defendant. (Exhibit "C," pages
205-208.) Further, counsel cross-examined
Detective Jackson regarding the Detective's
knowledge of Defendant, his potential bias
against Defendant and his alleged statements
to Defendant during the initial investigation
which the Detective denied making. (Exhibit
"C," pages 208-211, 213-214.) Accordingly,
this Court finds that Defendant has failed to
establish error by counsel or prejudice to his
case.

Ex. B2 at 44-45.

As noted previously, upon Petitioner's appeal, the appellate
court per curiam affirmed the trial court's order. Accordingly,
the claim was rejected on the merits by the state trial and
appellate courts. Thus, there are qualifying state court
decisions. This ground should be addressed applying the
deferential standard for federal court review of state court
adjudications, as required by AEDPA. The Court must next consider
the "contrary to" and "unreasonable application" components of the
statute. "It is the objective reasonableness, not the correctness
per se, of the state court decision that we are to decide." Brown

v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of the claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In evaluating the performance prong of the Strickland ineffectiveness inquiry, there is a strong presumption in favor of competence.   The presumption that Ms. Billard's performance was reasonable is even stronger since the record reflects that she is an experienced criminal defense attorney.[6]   See EH Tr. at 27. Thus, Petitioner must establish that no competent attorney would have taken the action that counsel, here, chose.   United States v.

---

[6] "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."   Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc), cert. denied, 531 U.S. 1204 (2001).   At the March 27, 2003, evidentiary hearing, Ms. Billard testified that she had been with the Public Defender's Office since May of 1991, had represented defendants in a "ton" of criminal trials and had appeared before Judge Arnold since about 1999.   EH Tr. at 27; see Williams v. Head, 185 F.3d 1223, 1229 (11th Cir. 1999) (noting that "[i]t matters to our analysis" whether the attorney is an experienced criminal defense attorney), cert. denied, 530 U.S. 1246 (2000).   Further, during the trial, the trial judge described Ms. Billard as Petitioner's "very adequate counsel."   Tr. at 234.

Freixas, 332 F.3d 1314, 1319-20 (11th Cir. 2003) (citations omitted).

As recognized by the trial court in denying the Rule 3.850 motion, Petitioner has failed to show deficient performance by defense counsel. Petitioner identifies Veronica Oliver, Cecil Bell, Donna Hogan, Desiree Glover and Clifford Harrell, who were present with him at the duplex (1613 West 10th Street) on October 22, 1999, when Detective Jackson arrived at that location in the course of conducting his investigation into the armed robbery of Hausen Clausell. With respect to these five witnesses, Petitioner alleges that they would have testified that Detective Jackson had told Petitioner that his name, "Josh," had "come up in the investigation, but he didn't have anything to worry about because he 'Jackson' knew that Petitioner wasn't involved." Petition at 6-7.

At trial, Detective Jackson testified about the circumstances that led him to investigate Petitioner's involvement in the armed robbery of Hausen Clausell. He contacted Mr. Clausell, and they "discussed exactly what occurred in the robbery." Tr. at 199.

> We discussed items about his cellular phone, about what numbers, the cellular phone numbers, and items like that. The procedure, what all happened, did he get injured. Pertinent information to the robbery.

Id. Detective Jackson stated that Mr. Clausell provided the name of a possible suspect: Joshua. Id. As part of the investigation,

Detective Jackson subpoenaed the records of the victim's cell phone that was stolen during the robbery to determine the recipients of the calls that were made after the robbery.   Id. at 201.   After receiving the cell phone records, Detective Jackson called some of the phone numbers and asked the individuals who had called them. Id. at 202.   In reviewing the cell phone records, he explained:

> One phone number particularly here, marked here, one of the phone numbers took me to an address 1613 West 10th Street.  It is like a two apartment duplex.  Joshua was sitting in the chair with a female trying to plat his hair or something and there were several other black males sitting on the other side.  1613 was a vacant apartment.  As I was talking to them[,] Josh recognized me and used Quinton[7].  I said I didn't remember you.  So I start talking.  I said I am investigating a robbery.  I said by the way, there is a name Joshua came up in this robbery.  I said I hope it is not you.

Id. at 202-03.   Detective Jackson described Petitioner's reaction to his statement.   Id. at 203.

> [He] [l]ooked at me for a little while and held his head down.  He walked off with this real slim black female and walked around the corner, and I don't know where they went from there.

Id.   On cross-examination, Detective Jackson denied telling Petitioner Hagan that he did not match the description of the robber and did not tell Petitioner that he had nothing to worry

---

[7] The record reflects that Petitioner Hagan and Detective Jackson's nephew (Quinton Crews) were friends.  Tr. at 208.

about because the robber was "five-six" and he was "six-one." Id. at 213.

Petitioner now contends that his defense counsel was ineffective for failing to call the above-listed five witnesses to testify that Detective Jackson told Petitioner that he knew he was not involved in the robbery, as opposed to telling Petitioner that he hoped he was not involved in the robbery. Petition at 6-8. Petitioner testified at the trial and therefore had the opportunity to explain his version of the events. Specifically, with respect to Detective Jackson's October 22, 1999, visit to the duplex as part of the investigation of the armed robbery, Petitioner stated:

> Before he came there he didn't come straight out about the robbery. He said something about what he -- about somebody else -- somebody else's name or something. Then he jumped on, well, I am also investigating a robbery that happened at Beaver Street at a club called Black Magic, and he said the address and he also say [sic] do you know anything about that. We were like, no, sir. Don't know nothing about that.
>
> Then he went on to saying the robbers who robbed this person there was a cellular phone involved in it. The robber who robbed this person called this house on the victim's cell phone. Do you know anything about that? We were like, no. No, sir, we don't. Then he went to going on -- then he said -- Detective Jackson spoke about the description of the robber. At this time I am like this here (indicating)[8].

---

[8] Petitioner indicated that he had his head down because he was getting his hair braided. Tr. at 251.

22

> . . . .

> He said the robber was five-six, gold in
> his mouth, and plats in his head.  He looked
> at me and said you are getting your head
> platted.  You got gold in your mouth but your
> height don't fit.  I was like what I got to do
> with this?  He said, I am just using you as an
> example.

Id. at 251-52.  Thus, Petitioner's contentions as to what the five

witnesses he alleged were present at the duplex on October 22,

1999, would have testified to had counsel called them as witnesses

at the trial, would have been cumulative to his own trial

testimony.  Defense counsel, in closing argument, reminded the jury

that Petitioner had explained to them that Detective Jackson set

forth the description of the robber and concluded that, since

Petitioner is six-one, "that is way off so I know you are not

involved."  Id. at 291.

    With respect to Gloria Jackson (Detective Jackson's sister and

Petitioner's alleged Godmother), Detective Jackson testified at

trial that, prior to making contact with Petitioner at the duplex,

he had met him "for the first time" about "a year or so ago" when

he came over to his house with his nephew, Quinton Crews, in a car

with Gloria Jackson.  Id. at 200-01.  On cross-examination,

Detective Jackson confirmed that he had previously met Petitioner

before this investigation began.  Id. at 208.  He believed that

Petitioner was still friends with his nephew, that Gloria Jackson

had brought Petitioner over to his house, that he did not know if

Gloria Jackson was Petitioner's Godmother, that he did not have "a problem" with Petitioner, that he did not blame anyone for leading his nephew astray and that he did not know how close his nephew and Petitioner were, as friends.  Id. at 208-09.

Petitioner now contends that his defense counsel was ineffective for failing to call Gloria Jackson to testify that Detective Jackson "disliked the Petitioner and that he felt that the Petitioner has a negative impact on [his nephew] Quinton Crews, and that the Petitioner was responsible for Quinton Crews being in trouble and mischief."  Petition at 7.  Petitioner concludes that Detective Jackson "singled the Petitioner out as [a] perpetrator for personal reasons without attempting to locate another suspect." Id.  Any potential testimony by Gloria Jackson in the defense case as to whether her brother, Detective Jackson, disliked Petitioner because of his alleged negative influence upon his nephew would have done nothing to negate the fact that it was the victim who supplied him with the first name of the possible perpetrator.  This occurred prior to Detective Jackson's assembling of the photo lineup.  Tr. at 204-08.  The record reflects the investigation that Detective Jackson conducted that eventually led him to Petitioner Joshua Hagan.   Also, notwithstanding any testimony Petitioner contends Gloria Jackson would have given, the record shows that it was solely Detective Jackson's investigation into the phone numbers called from the victim's stolen cell phone that led him to 1613

24

West 10th Street, not that he expected to find Petitioner at that
location.   Detective Jackson testified:

> [W]hen I conducted my investigation over the
> phones and the victim the numbers he had
> recovered from the phone company, the victim
> undoubtedly had made contact with these phone
> calls and came up with the possible name Josh.
> When I was doing my phone investigation to
> this address 10th Street I made contact with a
> Josh.   Then that made me kind of think well
> maybe possible suspect here.   I don't know,
> but I need to do further investigation to
> prove it.   So that was actually my first
> suspicion of him.

Id. at 222.   After further investigation and confirming
Petitioner's full name, Detective Jackson assembled the photo line
up containing Petitioner's picture from which the victim later
identified him as the armed robber.   Id. at 163-64, 203-05.
Additionally, the victim identified Petitioner in court as the
robber.   Id. at 154.

Defense counsel, in opening statement, pointed out that
Detective Jackson was biased against Petitioner Hagan.

> You will hear from Detective Jackson.
> Detective Jackson knew Joshua Hagan before
> this case ever began.   Joshua Hagan's God
> mother is Detective Jackson's sister.
> Detective Jackson's nephew is Joshua Hagan's
> God brother and they are friends.   They used
> to hang out together.   Detective Jackson's
> nephew has been in some trouble, and you will
> learn that he does not like Josh.   He blames
> Josh for his nephew's troubles.   Detective
> Jackson called Poneisha Lynch[,] learned that
> the boyfriend's name was Joshua Hagan,
> obtained a photograph of Joshua Hagan, and
> realized this is the kid that I don't like.
> This is the kid that has led my nephew down a

> bad path.  This is what he thinks.  He puts
> together a photo spread of six photos but none
> of them look like the robber. . . .

Id. at 145.

Additionally, defense counsel, in closing argument, again
reminded the jury that Detective Jackson was a biased witness who
failed to conduct an adequate investigation.

> Now let's talk first about Detective
> Jackson.  He knew Josh before the case came
> up.  He knew that Josh was friends with his
> nephew but he said I didn't know that his own
> sister was Josh's God mother.  Josh told you
> he used [sic] to see his God mother every day
> and was very close.  How would Detective
> Jackson not know that?  He is trying to
> distance himself from Josh.
>
> Ladies and gentlemen, this is a case
> about fairness.  Joshua Hagan is on trial for
> a very very serious crime, and he has not been
> treated fairly up until this point.  Now it is
> up to you, ladies and gentlemen of the jury.
> We talked in voir dire about fairness and how
> the whole point of selecting a jury system is
> fair.  It is our cornerstone in our
> Constitution and our country the right to a
> fair trial.  That is what separates the United
> States form [sic] other countries is this
> difference in the criminal justice system.  It
> is far from perfect, but it is the best in the
> country based on fairness.  It is a sacred
> duty and awesome responsibility and that is
> why you took an oath and promised to be fair.
> One of the requirements of fairness is there
> be an adequate investigation into the crime
> and that all leads be followed careful[ly].
> No stone should be left unturn[ed].  That is
> what we are here for is to seek the truth.
> The police should thoroughly investigate their
> case and follow all of the leads and not just
> stop when they find someone who has an
> indirect and innocent link to the crime.

> Ask yourselves these questions, ladies and gentlemen. Did Detective Jackson conduct an adequate investigation? Did he follow all of the leads? Did he call all of the phone numbers? Did he know today during the trial who all of the phone numbers belonged to? Did he know which of the numbers was called by Hausen Clausell and which were called by the robber? Did he know when Mr. Clausell's calls stopped and the calls of the robber's began? No, he didn't. Did he know which number belonged to the pink house? Were there other people there at the pink house? This is the duplex on 19th Street where he went several days after the robbery. Did he investigate how the cell phone came to be at the pink house? Who brought it there? Did he seem like he was prepared to testify today? Did he ask Hausen Clausell what the robber looked like? Did he prepare a photo spread that looked like the robber? No, he didn't. He prepared a photo spread that looked like Joshua Hagan because he had decided that Joshua Hagan was the one that did this crime.

Id. at 264-66. Thus, defense counsel's arguments reflect that she repeatedly reminded the jury that Detective Jackson was biased against Petitioner.

Given defense counsel's actions based on the record before this Court, defense counsel's performance was not deficient. Further, it is noteworthy that, by relying solely on Petitioner's testimony to bring his version of the events before the jury, as opposed to calling these six above-listed witnesses, under Florida's rules of criminal procedure, defense counsel secured Petitioner's right to the first and last closing arguments before the jury. Fla. R. Crim. P. 3.250; Tr. at 263-77, 290-98.

Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice.  Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given the assistance that Petitioner has alleged he should have provided.  Thus, this ineffectiveness claim is without merit.  <u>See</u> Response at 13-24.

### B. Ground 1(b)

As ground 1(b), Petitioner claims that defense counsel was ineffective for failure to investigate the cell phone records of the victim.  Petitioner contends that defense counsel would have discovered that other calls had been made on the stolen phone by someone other than Petitioner.  He states:

> The Petitioner admitted to using the phone which he borrowed from someone else. With proper investigation, it would have been discovered that calls had been made from the phone, following the robbery by someone other than the Petitioner.  But Detective Jackson did not consider other suspects because he wanted the Petitioner to stay away from Quinton Crews.

Petition at 8.  Respondents acknowledge that Petitioner raised this claim in his Rule 3.850 motion.  Response at 25.  The trial court adjudicated this claim on the merits.  In denying this claim, the trial court identified the two-prong <u>Strickland</u> ineffectiveness test as the controlling law and stated in pertinent part:

In ground four, Defendant asserts that counsel rendered ineffective assistance by failing to obtain the cell phone records of the victim to show that calls were made that could have been attributed to other individuals. This Court notes that counsel cross-examined Detective Jackson regarding his investigation of the cell phone calls and Detective Jackson conceded that several calls could not be attributed specifically to Defendant. (Exhibit "C," pages 220-231.) Additionally, this Court notes that Defendant testified regarding who he got the cell phone from and who made some of the phone calls. (Exhibit "C," pages 246-249.) Further, in light of the victim's identification of Defendant as the perpetrator of the charged offense, this Court finds that the presentation of additional individuals who potentially made phone calls on the cell phone would not have changed the outcome of the trial. Accordingly, this Court finds that Defendant has failed to establish error by counsel or prejudice to his case.

Ex. B2 at 45.

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order. Accordingly, the claim was rejected on the merits by the state trial and appellate courts. Thus, there are qualifying state court decisions. This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis of this claim because the state courts' adjudications of the claim were not contrary to clearly established federal law, did not

involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In evaluating the performance prong of the <u>Strickland</u> ineffectiveness inquiry, there is a strong presumption in favor of competence.  As recognized by the trial court in denying the Rule 3.850 motion, Petitioner has failed to show deficient performance by defense counsel.  The record of the trial proceedings reflects that it was never disputed that numerous calls from the victim's cell phone, including several made immediately following the armed robbery, could not be attributed to Petitioner.  Tr. at 201-04, 206-07, 221-33.  Defense counsel, in closing argument, stated:

> Did Detective Jackson start throwing out to you that Joshua's link to many of the calls without anything really to support it?  Well, I don't have my notes with me, but I know he was linked to all of these calls and then when I went down the list call by call, no, he wasn't.   There is nothing we could say he called the chat line.  There is no evidence he called the pink house.  There is no evidence he called this number.  There is no evidence he called this number.  [The transcript reflects that defense counsel repeated this statement.]  Finally, the eleventh number an hour and a half after the robbery is Poneisha Lynch and that was the link of Josh to the robbery is that he did call Poneisha Lynch on the cell phone after 11 other calls were made in an hour and a half after the robbery took place.
>
> Now, ladies and gentlemen, the common sense explanation is that whoever did the

robbery hopped in that black Mitsubishi
getaway car and started making all of these
calls. Those calls were made by the robber.
An hour and a half later the cell phone has
been dropped off at the pink house and poor
hung over drunk Josh stumbled over there to
call his girlfriend and happened to use that
telephone and that's why he is here.

Now did Detective Jackson know who all of
the numbers belonged to? Did he stumble when
I was asking him detailed questions about the
phone records? Shouldn't he know that? He is
the lead detective. These phone records are
critical. He didn't know. Shouldn't he have
been totally on top of this case? Does he
think he can just say I believe I have got the
right guy and everybody is going to take his
word for it? That is not how it works in
America thank goodness. We have a jury
system. We have you to hold the State's feet
to the fire to make sure they have proved and
to the exclusion of every reasonable doubt
that they in fact have the right man.
Detective Jackson was not a credible witness
and you cannot take his word for it. Do
officers sometimes make mistakes? Do officers
sometimes get lazy and not do a thorough job
when they think they have got the right guy?
I am not saying he is intentionally lying. I
am saying that he doesn't like Josh and he
stops when he get to him and he thinks he has
the right guy. But was he credible enough
that you will believe him blindly and not hold
the State's feet to the fire? That's the
question.

Id. at 267-69.

As found by the trial court in denying the Rule 3.850 motion,

Petitioner testified at the trial, stating that Derrick gave him

the victim's cell phone that he used to call his girlfriend,

Poneisha. Id. at 245. Petitioner further identified other

individuals who may have been responsible for the other calls made

31

from the victim's cell phone.  <u>Id</u>. at 246-29.  In closing argument, defense counsel reminded the jury that Petitioner did not commit the robbery, but merely had the misfortune to use a stolen cell phone.  <u>Id</u>. at 274-75.  Given defense counsel's actions based on the record before this Court, defense counsel's performance was not deficient.

Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice.  Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given the assistance that Petitioner has alleged he should have provided. Thus, this ineffectiveness claim is without merit.  <u>See</u> Response at 25-28.

## C. Ground Two

As ground two, Petitioner claims that appellate counsel was ineffective for failure to raise a <u>Batson</u>[9] claim on direct appeal.

---

[9] The test for determining the propriety of a challenge to a juror when there is an allegation that the challenge was based upon race was established in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). The Supreme Court further explained this test in <u>Purkett v. Elem</u>, 514 U.S. 765, <u>reh'g</u> <u>denied</u>, 515 U.S. 1170 (1995):

> Under our <u>Batson</u> jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2).  If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of

As noted by the Respondents, Petitioner raised this claim in his
*pro se* petition for writ of habeas corpus.  Ex. C1.  The appellate
court, at first, dismissed the petition for Petitioner's failure to
serve a copy of the petition upon the State Attorney.  Ex. C2.
However, the appellate court later granted his motion for
rehearing, stating "[a]n order or opinion relating to the merits of
the petition will be issued at a later date."  Id.  The appellate
court per curiam denied the petition without issuing a written
opinion.  Hagan, 834 So.2d 160; Ex. C3.  Thus, assuming that
Petitioner properly exhausted this claim, this ineffectiveness
claim is without merit.

---

the strike has proved purposeful
discrimination.  Hernandez v. New York, 500
U.S. 352, 358-359, 111 S.Ct. 1859, 1865-1866,
114 L.Ed.2d 395 (1991)(plurality opinion);
id., at 375, 111 S.Ct., at 1874 (O'CONNOR, J.,
concurring in judgment); Batson, supra, at 96-
98, 106 S.Ct., at 1722-1723.  The second step
of this process does not demand an explanation
that is persuasive, or even plausible.  "At
this [second] step of the inquiry, the issue
is the facial validity of the prosecutor's
explanation.  Unless a discriminatory intent
is inherent in the prosecutor's explanation,
the reason offered will be deemed race
neutral."  Hernandez, 500 U.S., at 360, 111
S.Ct., at 1866 (plurality opinion); id., at
374, 111 S.Ct., at 1874 (O'CONNOR, J.,
concurring in judgment).

Id. at 767-68; see McNair v. Campbell, 416 F.3d 1291, 1310 (11th
Cir. 2005), cert. denied, 126 S.Ct. 1828 (2006).

As noted previously, in Strickland, the United States Supreme Court articulated a two-pronged test for determining whether a defendant was denied constitutionally adequate assistance of counsel. "The same standard applies whether [a court is] examining the performance of counsel at the trial or appellate level." Eagle v. Linahan, 279 F.3d 926, 938 (11th Cir. 2001) (citing Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987)).

To demonstrate that his appellate counsel's performance was deficient, Petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687. "In considering the reasonableness of an attorney's decision not to raise a particular claim, [a court] must consider 'all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Eagle, 279 F.3d at 940 (quoting Strickland, 466 U.S. at 691). "Thus, '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time.'" Id. (quoting Strickland, 466 U.S. at 689). The reasonableness of counsel's assistance is reviewed in light of both the facts and law that existed at the time of the challenged conduct. Chateloin v. Singletary, 89 F.3d 749, 753 (11th Cir. 1996); see also Jones v. United States, 224 F.3d 1251, 1257-58 (11th Cir. 2000) (noting that

34

counsel's "failure to divine" a change in unsettled law did not constitute ineffective assistance of appellate counsel) (quoting Sullivan v. Wainwright, 695 F.2d 1306, 1309 (11th Cir. 1983)).

To determine whether Petitioner was prejudiced by his attorney's failure to raise a particular issue, the Court "must decide whether the arguments the [Petitioner] alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)), cert. denied, 531 U.S. 1131 (2001). "If [a court] conclude[s] that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." Eagle, 279 F.3d at 943 (citing Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)).

Here, as pointed out by the Respondents, the record reflects that trial counsel failed to preserve the Batson claim for appeal (to renew the Batson claim before accepting the jury).[10]  The

---

[10] "Under Florida law, simply objecting to the state's possibly discriminatory strikes, and then countering any purportedly race-neutral explanation given by the prosecution, does not suffice to preserve a *Batson* claim for appeal.  Rather, trial counsel must press the already rejected challenge a second time at the conclusion of voir dire, either by expressly renewing the objection or by accepting the jury pursuant to a reservation of this claim." Davis v. Sec'y for the Dep't of Corr., 341 F.3d at 1315 (citations omitted); Zack v. State, 911 So.2d 1190, 1204-05 (Fla. 2005) (stating the issue is not preserved for appellate review if the party objecting to the peremptory challenge fails to renew the

Supreme Court of Florida set forth the procedure to be followed at trial.

> In this claim, both parties rely on _Melbourne v. State_, 679 So.2d 759 (Fla. 1996), to explain the proper procedure for preserving a claim that a peremptory challenge is racially motivated.  In _Melbourne_, this Court explained that a party objecting to the other side's use of a peremptory challenge on racial grounds must:  (1) make a timely objection on that basis; (2) show that the venire person is a member of a distinct racial group; and (3) request that the court ask the striking party its reason for the strike.  The burden then shifts to the proponent of the strike to present a race-neutral explanation.  If the explanation is facially race-neutral and the court believes that the explanation is not a pretext, the strike will be sustained.  But even if the procedure is followed precisely, the issue is not preserved for appellate review if the party objecting to the challenge fails to renew the objection before the jury is sworn.  _See_ _Franqui v. State_, 699 So.2d 1332, 1334 (Fla. 1997); _Joiner v. State_, 618 So.2d 174 (Fla. 1993).  By not renewing the objection prior to the jury being sworn, it is presumed that the objecting party abandoned any prior objection he or she may have had and was satisfied with the selected jury.  _See_ _Joiner_, 618 So.2d at 176 ("[C]ounsel's action in accepting the jury led to a reasonable assumption that he had abandoned, for whatever reason, his earlier objection.  It is reasonable to conclude that events occurring subsequent to his objection caused him to be satisfied with the jury about to be sworn.").

> Defense counsel objected at the time the State exercised its peremptory challenge, but when the jury was sworn, he made no objection

---

objection before the jury is sworn); _Melbourne v. State_, 679 So.2d 759, 765 (Fla. 1996); _Joiner v. State_, 618 So.2d 174, 176 (Fla. 1993).

> to the final jury. The issue is therefore
> deemed abandoned. Appellate counsel has no
> obligation to raise an issue that was not
> preserved for review and is not ineffective
> for failing to raise an unpreserved issue on
> appeal. <u>See</u> <u>Randolph v. State</u>, 853 So.2d
> 1051, 1068 (Fla. 2003). Because this issue
> was not preserved for review and appellate
> counsel does not have an obligation to raise
> this issue on appeal, appellate counsel cannot
> be deemed ineffective.

<u>Zack v. State</u>, 911 So.2d 1190, 1204-05 (Fla. 2005).

Therefore, appellate counsel cannot be faulted for failing to raise this claim since it was not properly preserved. The record in this case reveals that while defense counsel did timely ask that the State provide a race-neutral reason for its use of a peremptory challenge against prospective juror Ms. Neal, that objection was not renewed prior to the jury's being sworn. Tr. at 109, 114-15. The State responded to defense counsel's request.

> Judge, the State, based upon observations
> of Ms. Neal, the fact that she did not
> verbally respond to a single question, at
> least in the State's inquiry, throughout the
> jury selection portion, and in watching Ms.
> Neal during the portion of defense counsel's
> inquiry she, again, did not verbally respond.
> I had reason, again, given her appearance,
> Judge, that she may have not understood the
> proceedings, and -- or drawing into question
> potentially her education or ability to
> understand criminal proceedings.

<u>Id</u>. at 109. The trial judge concluded: "At this point I'll tentatively permit it and we'll see where we are." <u>Id</u>. After the jury selection was completed, and the parties agreed that the jury was acceptable (<u>id</u>. at 113-14), the trial judge stated:

37

> During jury selection I had noted that I would
> tentatively allow the challenge to Ms. Neal,
> and obviously I did permit the challenge, and
> would note for the record that **one of my basis**
> for doing that is that Ms. Lewis is also a
> black female who was not challenged by the
> State as a member of the jury.

<u>Id</u>. at 116 (emphasis added).

Even assuming *arguendo* deficient performance by appellate counsel, Petitioner has not shown prejudice. Appellate counsel could have reasonably concluded that a <u>Batson</u> argument would not have been successful on direct appeal. As previously noted, Petitioner presented this ineffectiveness claim (appellate counsel's failure to raise the <u>Batson</u> violation on direct appeal) to the appellate court (Ex. C1), and the appellate court denied the petition. <u>Hagan</u>, 834 So.2d 160; Ex. C3. Petitioner was not prejudiced when the <u>Batson</u> violation was not included on direct appeal since the omitted claim would not have had a reasonable probability of success before the appellate court. This ineffectiveness claim is without merit.

### D. Ground Three

As ground three, Petitioner claims defense counsel was ineffective for failure to advise the trial court of the sleeping jurors. Respondents acknowledge that Petitioner raised this claim in his Rule 3.850 motion. Response at 34. After an evidentiary hearing on the issue, the trial court adjudicated this claim on the merits. In denying this claim, the trial court identified the two-

prong <u>Strickland</u> ineffectiveness test as the controlling law and

stated in pertinent part:

> In ground two, Defendant asserts that counsel rendered ineffective assistance by failing to object to sleeping jurors after Defendant informed counsel of this fact. During the evidentiary hearing, Defendant testified that he observed two jurors sleeping during the testimony of two witnesses. (Exhibit "E," pages 6-12.) Defendant testified that he informed his counsel, Ms. Debra Billard, that the jurors were sleeping and Ms. Billard explained that she would raise the issue in a Motion for New Trial.[11] (Exhibit "E," pages 6-15.) During cross-examination, Defendant acknowledged that the jurors were not snoring or falling out of their chairs and only had their eyes closed. (Exhibit "E," pages 16-17.) Defendant also acknowledged that the jurors did not appear to be sleeping during the victim's testimony. (Exhibit "E," pages [sic] 17.)

> Ms. Billard testified that she recalled two jurors with their eyes closed during closing arguments. (Exhibit "E," pages 20-21.) Ms. Billard testified that she did not know definitely that the jurors were actually asleep and she did not believe that any juror was in a deep sleep since no one was falling out of their chair. (Exhibit "E," pages 21-22.) Ms. Billard testified that the jurors were only asleep during closing arguments and she made a strategic decision not to bring the issue in front of the Court since closing arguments are not considered evidence. (Exhibit "E," pages 22-23.) Ms. Billard also testified that if a juror was asleep during a female witness' testimony, it was during the

---

[11] Ms. Billard raised the issue in a motion for new trial, stating: "Two of the jurors, Elizabeth McCollister and Sandra Allen, were observed sleeping during closing arguments." Ex. A3; EH Tr. at 12, 19, 21. Ms. Allen was the alternate juror. Tr. at 112-14; EH Tr. at 26.

State's case-in-chief since she only presented one witness, Defendant. (Exhibit "E," pages 23-24.) Additionally, Ms. Billard testified that she did not observe the jurors sleeping during any testimony. (Exhibit "E," page[s] 24-25.) Further, Ms. Billard testified that one of the jurors with her eyes closed was an alternate juror and Ms. Billard believed that raising the issue would not have accomplished anything since the State would have objected to the alternate. (Exhibit "E," pages 26-27.) This Court specifically finds that the testimony of Ms. Billard was more credible and more persuasive than Defendant's allegations and testimony. <u>Laramore v. State</u>, 699 So.2d 846 (Fla. 4th DCA 1997). Further, this Court finds that counsel's decision not to object to the alleged sleeping jurors amounted to trial strategy and therefore is not subject to a claim of ineffective assistance of counsel. (Exhibit "D," pages 6-9, 24-26.) <u>Remetta v. Dugger</u>, 622 So.2d 452 (Fla. 1993); <u>Gonzales v. State</u>, 691 So.2d 602, 603 (Fla. 4th DCA 1997) ("Tactical or strategic decisions of counsel do not constitute ineffective assistance of counsel.") Accordingly, this Court finds that Defendant has failed to establish error by counsel or prejudice to his case.

Ex. B2 at 43-44.

As noted previously, upon Petitioner's appeal, the appellate court per curiam affirmed the trial court's order. Accordingly, the claim was rejected on the merits by the state trial and appellate courts. Thus, there are qualifying state court decisions. This ground should be addressed applying the deferential standard for federal court review of state court adjudications, as required by AEDPA.

Upon a thorough review of the record and the applicable law, it is clear that Petitioner is not entitled to relief on the basis

of this claim because the state courts' adjudications of the claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In evaluating the performance prong of the <u>Strickland</u> ineffectiveness inquiry, there is a strong presumption in favor of competence, especially when the record reflects that defense counsel is an experienced criminal defense attorney. Ms. Billard, at the March 27, 2003, evidentiary hearing, noted that she had appeared as defense counsel before Judge Arnold since 1999. EH Tr. at 27. She explained his procedure when he notices that a juror is sleeping in the courtroom.

> He pays good attention to the jury and I think that if he had noticed somebody truly asleep that he would have said, [l]et's all stand up and take a stretch, or, [l]et's have a short recess, or something like that, without wanting to embarrass them and call attention to them, but just to get them to wake up.

<u>Id</u>. As recognized by the trial court in denying the Rule 3.850 motion, Petitioner has failed to show deficient performance by defense counsel. Ms. Billard did not observe the two jurors sleeping during any testimony, but rather she saw them with their eyes closed during closing arguments. <u>Id</u>. at 21-24. Given defense

41

counsel's actions based on the record before this Court, defense counsel's performance was not deficient.

Even assuming *arguendo* deficient performance by defense counsel, Petitioner has not shown prejudice.  As noted by Ms. Billard at the evidentiary hearing, Ms. Allen was an alternate juror, who did not participate in the deliberations and verdict. EH Tr. at 26; Tr. at 310-12.  Clearly, all the jurors were present and heard the testimony of the witnesses.  Only Ms. McCollister, as one of six jurors, may have missed a portion of the closing arguments of the State <u>or</u> the defense.  Petitioner has not shown that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given the assistance that Petitioner has alleged he should have provided.  Thus, this ineffectiveness claim is without merit.  <u>See</u> Response at 34-39. Finally, based on an exhaustive review of the trial record, Petitioner received a fair trial.

## VII. Conclusion

Any other claims not specifically addressed are found to be without merit.  Accordingly, for all of the above-stated reasons, the Petition will be denied and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** in chambers in Jacksonville, Florida, this 27th day of November, 2006.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

sc 11/24
c:
Joshua Hagan
Ass't Attorney General (Jordan)